**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JEROME SENEGAL, ERIKA WILLIAMS, BRENT GRIFFIN, IRVIN NASH, AMANDA JASON, and KELLIE FARRISH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>JPMORGAN CHASE BANK N.A.,<br><br>Defendant. | Case No.<br><br><br>**Jury Trial Requested** |

## CLASS COMPLAINT

Plaintiffs Jerome Senegal, Erika Williams, Brent Griffin, Irvin Nash, Amanda Jason, and Kellie Farrish ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, Stowell & Friedman, Ltd., hereby file this Complaint of race discrimination against Defendant JPMorgan Chase Bank N.A. ("Defendant" or "Chase" or "the Firm"), and in support state as follows:

## OVERVIEW

1.      JPMorgan Chase & Co. is a leading global financial services firm. It is the largest bank in the United States by market value and the sixth-largest in the world by trading assets.[1] As of December 31, 2016, JPMorgan Chase & Co. had a market capitalization of $307.3 billion and held $2.5 trillion in assets.[2]

---

[1] https://www.bloomberg.com/news/articles/2016-09-13/wells-fargo-eclipsed-by-jpmorgan-as-world-s-most-valuable-bank.

[2] Annual Report 2016, JPMorgan Chase & Co., https://www.jpmorganchase.com/corporate/investor-relations/document/2016-annualreport.pdf.

2.      Through its subsidiaries, J.P. Morgan Securities, LLC and JPMorgan Chase Bank N.A., Chase is one of the largest providers of financial advisory and brokerage services.  Chase employs approximately 3,000 Financial Advisors ("FAs") to service investors across more than 5,000 branch locations throughout the United States.  During 2016, these FAs managed invested assets with a combined value of $235 billion.[3]

3.      Chase provides widely divergent compensation and opportunities to the FAs who service its clients, depending on their race. African Americans are underrepresented as Chase FAs and paid substantially less than their counterparts who are not African American.  These racial disparities result from Chase's systemic, intentional race discrimination and from policies and practices that have an unlawful disparate impact on African Americans.

4.      Plaintiffs, and the class they seek to represent in this lawsuit, challenge the Firm's company-wide policies and practices that result in higher rates of attrition and lower pay for African Americans and that segregate the Chase workforce by race.

5.      This lawsuit is brought by Plaintiffs on behalf of themselves and other African American Chase Financial Advisors who work or worked as registered brokers and have been subjected to and harmed by its company-wide pattern or practice of race discrimination and discriminatory policies and practices.  This action seeks class-wide injunctive relief to reform the challenged practices and make-whole relief for class members.

## JURISDICTION AND VENUE

6.      Plaintiffs' claims arise under 42 U.S.C. § 1981,[4] and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

---

[3]*Id.*
[4] Plaintiffs intend to amend this Complaint and add Title VII charges after they have exhausted their administrative remedies and receive a Right to Sue notice from the EEOC.

7.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b).  Defendant is licensed to do business in this District, operates numerous bank branches throughout this District, and services clients who are residents of this District.  Throughout their tenure at Chase, Williams and Griffin resided in this District, and Williams worked for and was harmed by Chase in this District.  The unlawful conduct alleged in this Complaint occurred in this District and across the United States.

## PARTIES

8.      JPMorgan Chase & Co. is a publicly-traded, global financial services firm and Fortune 500 corporation that is incorporated in Delaware and headquartered in New York City. JPMorgan Chase Bank, N.A. is a wholly owned subsidiary of JPMorgan Chase and a nationally-chartered bank.  Chase manages $2.5 trillion of client assets and provides financial products and services to its global and domestic clients, including corporations, governments, other financial institutions, and individuals.  In 2016, Chase achieved $95.7 billion of net revenues, and $24.7 billion of net income.[5]

9.      Plaintiff Jerome Senegal ("Senegal") is African American and was employed as a Chase FA in Houston, Texas from December 2007 until April 29, 2016.  Throughout his employment at Chase, and pursuant to Defendant's pattern or practice of discrimination and company-wide discriminatory policies, Chase assigned Senegal to less lucrative banks and territories and denied him resources, teaming opportunities, and business opportunities, including lucrative client accounts, because of his race.  Chase treated Senegal worse than similarly situated Chase employees who are not African American, and Senegal lost income and was otherwise harmed as a result of Defendant's unlawful conduct.

---

[5] Annual Report 2016, JPMorgan Chase & Co., https://www.jpmorganchase.com/corporate/investor-relations/document/2016-annualreport.pdf.

3

10.     Plaintiff Erika Williams ("Williams") is African American and was employed as a Chase FA in Chicago, Illinois from July 2013 until June 2016. Throughout her employment at Chase, and pursuant to Defendant's pattern or practice of discrimination and company-wide discriminatory policies, Chase assigned Williams to less lucrative banks and territories and denied her resources, teaming opportunities, and business opportunities, including lucrative client accounts, because of her race. Chase treated Williams worse than similarly situated Chase employees who are not African American, and Williams lost income and was otherwise harmed as a result of Defendant's unlawful conduct.

11.     Plaintiff Brent Griffin ("Griffin") is African American. He resides in Illinois and has worked as a Chase FA in Kenosha, Wisconsin from July 2013 to May 2017. Throughout his employment at Chase, and pursuant to Defendant's pattern or practice of discrimination and company-wide discriminatory policies, Chase assigned Griffin to less lucrative banks and territories and denied him resources, teaming opportunities, and business opportunities, including lucrative client accounts, because of his race. Chase has treated Griffin worse than similarly situated Chase employees who are not African American, and Griffin has lost income and was otherwise harmed as a result of Defendant's unlawful conduct.

12.     Plaintiff Irvin Nash ("Nash") is African American and worked as a Chase FA in New Rochelle and later Mount Vernon, New York from May 2011 until July 2015. Throughout his employment at Chase, and pursuant to Defendant's pattern or practice of discrimination and company-wide discriminatory policies, Chase assigned Nash to less lucrative banks and territories and denied him resources, teaming opportunities, and business opportunities, including lucrative client accounts, because of his race. Chase treated Nash worse than similarly situated

4

employees who are not African American, and Nash lost income and was otherwise harmed as a result of Defendant's unlawful conduct.

13.     Plaintiff Amanda Jason ("Jason") is African American and worked as a Chase FA in Lexington, Kentucky from September 2009 until October 2013.  Throughout her employment at Chase, and pursuant to Defendant's pattern or practice of discrimination and company-wide discriminatory policies, Chase assigned Jason to less lucrative banks and territories and denied her resources, teaming opportunities and business opportunities, including lucrative client accounts, because of her race.  Chase treated Jason worse than similarly situated Chase employees who are not African American, and Jason lost income and was otherwise harmed as a result of Defendant's unlawful conduct.

14.     Plaintiff Kellie Farrish ("Farrish") is African American and has been employed as a Chase FA in Antioch, California since October 2011.  Throughout her employment at Chase, and pursuant to Defendant's pattern or practice of discrimination and company-wide discriminatory policies, Chase has assigned Farrish to less lucrative banks and territories and denied her resources, teaming opportunities and business opportunities, including lucrative client accounts, because of her race.  Chase has treated Farrish worse than similarly situated Chase employees who are not African American, and Farrish has lost income and otherwise been harmed as a result of Defendant's unlawful conduct.

## FACTUAL ALLEGATIONS

15.     Chase maintains strict, centralized control over its wealth management business from its company headquarters, where an all-white team of senior executives designs and issues mandatory, company-wide policies and practices governing its Financial Advisor workforce. These include uniform, Firm-wide policies and practices that govern compensation, teaming, and

the assignment of territory, resources, designations and business opportunities. These practices segregate its workforce, discriminate against African Americans, and have a disparate impact on African Americans that is not justified by business necessity.

16.     Chase Financial Advisors advise and service Chase's clients across the country and are compensated pursuant to uniform, nationwide compensation plans. Due to the commission-based incentive system under which FAs are compensated at Chase, and the Firm's business practices regarding advancement, a level playing field and fair distribution of resources and business opportunities are essential.

17.     Defendant's policies and practices, however, do not create an equal playing field for African Americans, but instead result in significant compensation and attrition disparities based on race.

18.     Most Chase FAs operate out of Chase's more than 5,000 community-based bank branch locations.[6] Chase studies and ranks its bank branches and territories according to various metrics and demographic data, including client and community wealth, asset base, and other measures of opportunity in a given branch or territory. As a result of racial stereotypes, race matching and racial redlining, Chase disproportionately assigns African American FAs to less lucrative branches and territories, with fewer investable assets and less wealthy clients and potential clients.[7] White FAs are assigned to wealthier territories with greater opportunities. These practices dramatically limit the compensation and advancement opportunities and increase attrition of African American FAs.

---

[6] Although FAs work for and are supervised by Chase and J.P. Morgan Securities, LLC, they are housed in Chase Bank branch locations and interact with Chase Bank managers and bankers on a daily basis.
[7] The few African American FAs assigned to more affluent branches often have these branches taken away, or have their best accounts or opportunities targeted by FAs who are not African American.

19.     A significant portion of the business opportunities of bank-based FAs is derived from leads and support from licensed bankers working in the branches to which the FAs are assigned.  African American FAs, however, are assigned branches with no or fewer licensed bankers.  African American FAs are also often assigned to multiple, smaller branches, diluting their time and resources, and limiting the FAs' ability to form consistent, productive relationships with lead-generating bankers and clients.  As a result, and by the Firm's design, African American FAs have less lucrative accounts and territories than their non-African American colleagues.

20.     Chase has established a prestigious Private Client program reserved for clients with over $250,000 in assets held with Chase.  Chase provides these special, high net worth clients with Private Client Bankers, additional personal service, lower costs for transactions, access to J.P. Morgan expertise and planning advice, and other benefits at select branch locations.[8]  Chase Private Client customers are referred to invest with specified Chase Private Client Financial Advisors, and only Private Client FAs may service these clients.  Access to Chase Private Client customers results in substantially greater business and income opportunity for Private Client FAs.

21.     African Americans are disproportionately excluded from becoming Chase Private Client FAs, working at Chase Private Client bank branches, and teaming with Chase Private Client Bankers.  The assignment and selection of Private Client FAs segregates African American FAs and alters the terms and conditions of their employment. African Americans are disproportionately denied designation as Private Client FAs and, subsequently, access to the Private Client pool and its valuable leads and referrals, based on discriminatory practices and

---

[8] J.P. Morgan is Chase's private bank and is typically reserved for investors with a minimum of $10 million in investable assets.

criteria. Among other things, for example, the Firm conditions Private Client FA status on an FA's per-client asset level, rather than overall investment volume, which has a disparate impact on African American FAs. Chase Private Client locations are also largely in affluent areas and are disproportionately absent from predominantly African American communities, to which African American FAs are steered by Chase.[9]

22.     African American FAs are similarly denied opportunities to team with Private Client Bankers, who have relationships with and access to high net worth clients and potential clients. Private Client Bankers team with Private Client FAs for the most lucrative client relationships.

23.     In sum, the Firm's policies and practices discriminate against African American FAs by distributing lucrative leads, referrals, teaming opportunities and resources to FAs based on their race, and often their designation as Chase Private Client FAs, a segregated club from which African Americans are largely excluded.[10] In many respects, Chase relies on factors that have a disparate impact on African Americans and disproportionately benefit white FAs, including by prescribing criteria "that favor the already successful – those who may owe their success to having been invited to join a successful or promising team." *McReynolds v. Merrill Lynch*, 672 F.3d 482, 490 (7th Cir. 2012).

24.     African Americans are further harmed by the Firm's compensation policies and practices, which intentionally discriminate against African American FAs in a number of ways, including by knowingly relying on factors that disadvantage African Americans. These include

---

[9] Although Chase has recently begun to expand the Private Client branding beyond its more affluent locations, these newer Private Client branches lack the same wealth, resources and opportunity of the more affluent branches to which white FAs are assigned.

[10] Even the few African American Private Client FAs are denied the same opportunities as their non-African American counterparts due to their branch assignment and the Firm allowing their client base to be targeted by more affluent Chase branches and other Private Client FAs who are not African American.

the types and amounts of assets, products, and transactions that generate commissions, and the corresponding commission rates, among other features. These compensation practices do not reward productivity, but instead serve the purpose of diminishing the compensation of African American FAs, barring them from lucrative programs in the Firm, and limiting their growth potential and pay.

25.     FAs are compensated on commissions earned from transactions performed for the benefit of clients. Investors in the less-affluent communities to which Chase assigns African American FAs tend to have a higher proportion of low-risk investments such as fixed annuities, which do not generate commissions for the FA after the initial account is established. Further, fixed annuities are paid out to clients on a monthly basis and result in net negative asset flow to FAs, which Chase then uses to penalize FAs by dramatically limiting their commission payout rate under the "alternate grid." The Firm's alternate grid discriminates against African American FAs and was instituted in order to force African American FAs to leave Chase.

26.     Chase's compensation practices also harm its lower-income and African American clients, whose accounts are less valued by the Firm. Chase incentivizes FAs to avoid advising and servicing lower-income customers' investment accounts by refusing to compensate FAs for the asset types and asset levels often held by these poorer, disproportionately minority, clients.

27.     In sum, Defendant has and is engaged in an ongoing nationwide pattern and practice of race discrimination and knowingly employs company-wide policies and practices that have a disparate impact on African Americans. Defendant's systemic discrimination against African Americans includes, but is not limited to, the following practices that are both intentionally discriminatory and have an unlawful disparate impact on African Americans:

9

a) Employing firm-wide policies and practices regarding the assignment, distribution and transfer of client accounts, leads, referrals, and other business opportunities that disproportionately steer lucrative accounts and compensation opportunities to Financial Advisors who are not African American;

b) Employing firm-wide policies and practices that assign African Americans to less lucrative territories and branches, including by open race matching and racial steering, and result in a segregated workforce and substantial racial disparities in earnings and attrition rates;

c) Employing firm-wide policies and practices that deny African Americans teaming opportunities, resources, and support on account of race, including licensed banking, Chase Private Client, management support, and other resources;

d) Employing firm-wide policies and practices regarding the assignment of jobs, titles, and designations, including but not limited to the Chase Private Client and JP Morgan designations, that disproportionately exclude African Americans;

e) Employing firm-wide policies and practices regarding hiring and assignment to the firm's high net worth FA positions, including but not limited to Chase Private Client and JP Morgan, that harm and exclude African Americans;

f) Employing firm-wide, discriminatory policies and practices regarding job assignment, promotion, and management assessment and selection that harm and exclude African Americans; and

g) Employing firm-wide compensation policies and practices that disproportionately disadvantage African Americans.

28.     The intentional discrimination and disparate impact described above is ongoing and constitutes a continuing violation of the civil rights laws.

29.     The racially discriminatory policies and practices at Chase are uniform and national in scope.  Class members relying on Plaintiffs to protect their rights work or worked at Chase offices across the country and were harmed by these same policies and practices.

**Plaintiffs Were Injured By Defendant's Unlawful Conduct**

30.     Plaintiffs, like other African American FAs, were subjected to and harmed by Defendant's pattern or practice of discrimination and unlawful policies and practices.  Among

10

other things, Plaintiffs were assigned to less lucrative territories, denied licensed banker and other necessary support, and denied client accounts, leads, referrals and other business opportunities because of their race. Plaintiffs lost substantial income as a result and due to Defendant's discriminatory compensation practices.

31.     Plaintiff Jerome Senegal joined Chase in 2007 after over 20 years of success as a financial advisor at Merrill Lynch and Morgan Stanley. Senegal worked hard and successfully developed clients at the three branches in his territory. Consistent with Chase's race-matching and discriminatory territory assignment practices, however, Chase stripped Senegal of his two best branches and reassigned those to white FAs. Chase then assigned Senegal to three lower income and less lucrative branches with a much higher concentration of minorities and African Americans. These branches provided Senegal with considerably less opportunity to generate clients and earn compensation, and some required heightened physical security and even bulletproofing of teller windows. Chase similarly assigned the only two other African Americans in Senegal's region to lower income branches in predominantly minority markets.

32.     Throughout his tenure, Chase denied Senegal other business opportunities and support, including client accounts, leads, referrals and licensed banking and other sales support. Although Senegal reached the required production level and had over 25 years' experience serving high net worth clients, Chase denied his request to be a Chase Private Client FA, thereby denying him access to clients with more investable assets and a dedicated Chase Private Client banker to generate client leads and referrals. Senegal's requests for better branches and his complaints about his treatment and lack of opportunity were ignored, and resulted in increased hostility.

33.     Because of the Firm's discriminatory practices, Senegal's earnings were substantially diminished, as were his advancement opportunities.  Senegal was further harmed by the Firm's compensation practices, which were intended to punish and drive him and other African American FAs from the Firm.  Senegal lost commission credit for more than 1,000 of his clients.  Senegal was unlawfully terminated in April 2016.

34.     Plaintiff Erika Williams was recruited by Chase in 2013 well equipped to succeed, armed with a Master's in Business Administration ("MBA") from the University of Chicago and experience as a financial advisor with a major brokerage firm.  Consistent with Chase's racial steering and discriminatory territory assignment practices, Chase assigned Williams to its Stony Island branch in the South Side Chicago region, a predominantly African American area.  Of the approximately 20 bank branches in the South Side region, Chase did not assign a single white FA to service any of these branches.

35.     Over her tenure at Chase, Williams maintained client relationships at up to five branches on the South Side, all of which were located in neighborhoods whose residents' median household incomes lagged behind Chicago's average and which were predominantly African American.  Due to the lack of opportunity in her territory, Williams sought transfers to open more lucrative branches (including downtown, River North, and Streeterville branches), but her requests were all denied.

36.     Although Williams was able to become a Chase Private Client FA once her Hyde Park branch was cynically rebranded a Chase Private Client location, the branch was not a dedicated Chase Private Client Branch, nor did it receive the same support or opportunities.  To the contrary, Chase allowed Williams' most lucrative potential investors to be poached by white

FAs in the downtown branches. Chase denied Williams lucrative client accounts, leads, referrals, and resources and support, including licensed banking support.

37.    Due to Chase's discriminatory territory assignment and lack of institutional support, Williams lost substantial earnings. The Firm's punitive compensation scheme and minimum per-client asset commission thresholds forced Williams to relinquish many client accounts, and her commissions dropped substantially, ultimately resulting in her being paid on the "alternate grid." Williams' complaints about her treatment and the Firm's practices fell on deaf ears, and her requests for help were denied. Due to the Firm's escalating discrimination and discriminatory practices, Williams had no choice but to resign and was constructively discharged in 2016.

38.    Plaintiff Brent Griffin first obtained his securities licenses in 1999 and gained experience as a financial advisor and an investment banker. Griffin sought a Financial Advisor position at Chase in 2009 and despite his prior experience as an FA, was steered instead to a licensed banker role, with the promise that he could eventually transition to an FA role. Griffin left Chase in 2011 after the Firm refused to promote him to an FA role.

39.    Griffin returned to Chase in 2013, when he was finally offered an FA opportunity. Chase assigned him to a bank branch in Kenosha, Wisconsin; he was the only African American FA of over 50 FAs in the state of Wisconsin. The Kenosha branch had a significantly higher proportion of African American clients than nearly every other branch in his market, ultimately earning the designation of a "high-risk branch" requiring heightened physical security and bulletproofing surrounding the teller area. In addition to being assigned to less lucrative territories, Griffin was otherwise denied business opportunities, resources and management support. Griffin sought additional, more lucrative branches, to no avail. For example, after being

passed over for a number of opportunities, in 2016 Griffin accepted a second branch assignment in nearby Racine, only to learn that the departing FA was allowed to retain all of the client relationships, requiring Griffin to start with no client accounts. When that same FA decided to retire from Chase in early 2017, barely a year later, the relationships from the Racine branch were not reassigned back to the branch, but were instead assigned to another white FA at a different branch. As a result of his treatment, Griffin's earnings fell as he lost commissions due to the Firm's imposition of a minimum account size for which he would be compensated, as well as the application of the alternate grid.

40.     Even as Chase embarked on an initiative to designate more branches as Chase Private Client branches, Griffin continued to be bypassed, although nearly every other branch and FA in his market received such designation. By early 2017, in spite of being in the top rankings in his market for net-new money, the denial continued.  Every other FA in his market with more than one year of experience at Chase had a Chase Private Client designation. Griffin was denied lucrative Chase Private Client referrals and lost his own high net worth clients, who were allowed to move to another Chase Private Client FA and Chase Private Client branch in order to access Chase Private Client services.

41.     Plaintiff Irvin Nash joined Chase in May 2007 after serving as a licensed financial advisor at Merrill Lynch. Nash was hired to fill the vacancy at Chase's New Rochelle, New York branch that was created when the Caucasian FA at that branch was transferred to a newly-constructed, dedicated Chase Private Client branch. At the time Nash joined the New Rochelle branch, there were five bankers at the location, including two Chase Private Client bankers, who could only refer to Chase Private Client FAs. Nash sought but was denied Chase Private Client designation throughout his tenure at Chase.  As a result, he lost substantial referrals and high net

14

worth client opportunities. Lacking Private Client designation, Nash could develop only relationships which were, by definition, of substantially lesser value.

42.     After an FA servicing the Firm's Mount Vernon branch left the Firm, Chase assigned Nash to the Mount Vernon branch as well. Unlike the New Rochelle branch, the Mount Vernon branch served a predominantly African American market and was not a Chase Private Client branch. The average median income in Mount Vernon was well below that of New Rochelle.[11] Not only did Mt. Vernon lack a Chase Private Client designation or Chase Private Client bankers, most of the investment accounts associated with the branch were valued at $50,000 or less, well below the $250,000 Chase Private Client threshold. Chase then stripped New Rochelle from Nash's territory, directing him to work exclusively out of the Mount Vernon branch, which his manager said was a "better fit." Chase replaced Nash at the New Rochelle branch with a Caucasian FA, and gave that FA the Chase Private Client designation that Nash repeatedly sought but was denied over the three-year period he served as the New Rochelle FA.

43.     Chase then implemented a minimum $50,000 account threshold for FA compensation, meaning that he earned no compensation from most of his Mount Vernon client relationships, and his income dropped precipitously as a result. Chase's response to Nash's complaints about his limited opportunity was to assign him a 2nd and then 3rd branch in Mt. Vernon. The addition of more branches in the same demographic area did little to improve opportunity for Nash, who had no choice but to resign. He was constructively discharged in 2015.

44.     Plaintiff Amanda Jason joined Chase in May 2009 after obtaining her licenses and gaining financial advisory experience at a major securities firm. Chase initially assigned Jason to

---

[11] Per the 2010 U.S. Census, 61.3% of Mt. Vernon's 67,000 residents were African American, compared to 18% of New Rochelle's 77,000 residents.

a territory comprising two bank branches in close proximity to each other in Lexington, Kentucky, one new branch and one well-established branch. Shortly thereafter, Chase stripped Jason of the established, successful branch and reassigned it to a white FA. Chase instead assigned Jason to a branch much farther away, in an area with a lower median income, significantly higher African American population, and in a neighborhood known for higher overall crime rates. This experience was consistent with Jason's tenure at Chase, as valuable opportunities and resources were redirected to white FAs.

45.     In 2013, Chase granted Jason the Private Client FA designation, despite the lack of opportunity and high net worth prospects in her territory. However, unlike her Chase Private Client counterparts who were not African American, Jason was not allowed to team with a Private Client Banker, an essential partner to provide high net worth customer leads, and was instead forced to seek out opportunities on her own. Jason was otherwise denied leads, referrals and the management support and resources necessary to compete and produce. FAs who were not African American were not encumbered by underperforming branches or similarly discouraged in their businesses. Jason became increasingly frustrated at being disregarded and denied equal opportunity and had no choice but to resign. Jason was constructively discharged in October 2013.

46.     Plaintiff Kellie Farrish joined Chase in October 2011 after earning her securities licenses and serving as a financial advisor for Merrill Lynch. Consistent with the Firm's racial steering and discriminatory territory assignment practices, Chase assigned Farrish to two branches in Antioch, California, which it designated as "low to moderate income" due to the smaller per-client deposit and investment potential. Antioch has a majority-minority population with a substantial African American and Hispanic population. Due to the lack of income-earning

16

potential in her territory, Farrish regularly requested assignment to other, more lucrative branches, to no avail. Instead, Chase assigned Farrish to additional lower income branches, with no additional investment opportunities but which required her to spend time additional time in transit and attempting to service a larger number of branches and customers. Chase has recently announced that it will close one of Farrish's three branches because it is unprofitable.

47.     Throughout her tenure, Chase has denied Farrish business opportunities and support, including client accounts, leads, referrals and licensed banking and other sales support. Despite her years of servicing high net worth clients, Chase has refused to designate Farris (and another African American FA in her region) a Private Client FA, denying her the ability to team with and garner referrals from Private Client Bankers. Worse, Chase has allowed the few Private Client-eligible clients in her limited territory to be targeted by FAs in Oakland and San Francisco with the promise of Private Client services the Firm prohibits Farrish from providing. Farrish has lost substantial income under the Firm's compensation practices, including investment minimums that exceed the investable wealth of the Chase clients she works hard to service and the Firm's regressive "alternative grid" commission structure designed to force out Chase FAs who service the Firm's "poorer" clients.

48.     All Plaintiffs lost wages and other benefits, suffered emotional distress and other nonpecuniary losses, and suffered irreparable harm to their careers as a result of Chase's unlawful conduct and discriminatory practices. Defendant's actions have caused and continue to cause Plaintiffs substantial losses in earnings, management opportunities and other employment benefits, in an amount to be determined by a jury.

## CLASS ALLEGATIONS

49.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of African Americans who worked for Chase as FAs and who were subjected to discrimination by Chase due to their race. All requirements of class certification are met by the proposed class.

50.     The class of African American employees and former employees is so numerous that joinder of all members is impracticable.  FED. R. CIV. P. 23(a)(1).

51.     There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation.  FED. R. CIV. P. 23(a)(2).

52.     The claims alleged by Plaintiffs are typical of the claims of the class members. FED. R. CIV. P. 23(a)(3).

53.     Plaintiffs will fairly and adequately represent and protect the interests of the class. FED. R. CIV. P. 23(a)(4).

54.     The proposed class also meets the requirements for certification under Rule 23(b)(2) and/or Rule 23(b)(3).  The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3).

55.     The issues of determining liability and equitable relief, among other issues, are also appropriate for certification under Rule 23(c)(4), as are other common issues.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

56.     Plaintiffs, on behalf of themselves and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count I of this Complaint.

57.     Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race.  The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, and conditions of the contractual relationship.

58.     Chase maintains a nationwide set of uniform, discriminatory employment practices and engaged in a pattern or practice of systemic race discrimination against African Americans that constitutes illegal intentional racial discrimination in violation of 42 U.S.C. § 1981.

59.     Through the conduct alleged herein, Chase denied Plaintiffs and other African American FAs business opportunities (including but not limited to client accounts, leads, and referrals); assignment of favorable branch office locations; resources valuable to their career and business; and sales, administrative and management support because of their race and based on racial stereotypes.  Defendant also discriminated against Plaintiffs and African Americans in compensation and in other terms and conditions of their employment.

60.     Plaintiffs and all those similarly situated were subjected to and harmed by Chase's systemic and individual discrimination.

61.     On behalf of themselves and the class they seek to represent, Plaintiffs request the relief set forth below.

## COUNT II

### RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

62.     Plaintiffs reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count II of this Complaint.

63.     Plaintiffs allege that they engaged in protected activity by complaining of their unlawful treatment.

64.     Plaintiffs allege that they suffered retaliation and harm because of their protected activity, in violation of 42 U.S.C. § 1981.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court find against Defendant as follows:

a.      Certify this case as a class action;

b.      Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c.      Declare that Chase's acts, conduct, policies and practices are unlawful and violate 42 U.S.C. § 1981 and 42 U.S.C. §§ 2000e et seq.;

d.      Declare that Chase engages in a pattern and practice of racial discrimination against African Americans and employs policies and practices that have an unlawful disparate impact on African Americans;

e.      Order Plaintiffs and all others similarly situated reinstated to their appropriate positions, promotions, and seniority, and otherwise make Plaintiffs whole;

20

f.      Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of Chase's unlawful conduct;

g.      Award Plaintiffs and all others similarly situated compensatory and punitive damages;

h.      Award Plaintiffs and all others similarly situated prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

i.      Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive, and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs; and

j.      Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.


## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiffs hereby demand a jury trial as provided for by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully submitted on behalf of Plaintiffs and those similarly situated,

*s/ Linda D. Friedman*

STOWELL & FRIEDMAN LTD.

Linda D. Friedman
Suzanne E. Bish
George S. Robot
STOWELL & FRIEDMAN LTD.
303 W. Madison, Suite 2600
Chicago, Illinois  60606
(312) 431-0888