## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JEROME SENEGAL, ERIKA WILLIAMS,
BRENT GRIFFIN, IRVIN NASH, AMANDA
JASON, and KELLIE FARRISH, on behalf of
themselves and those similarly situated,

                           Plaintiffs,

     v.

JPMORGAN CHASE BANK, N.A.,

                           Defendant.

**Case No. 18-cv-6006**

**Judge Manish S. Shah**

### PLAINTIFFS' MOTION FOR PROVISIONAL CLASS CERTIFICATION, PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, AND APPROVAL AND DISTRIBUTION OF NOTICE OF SETTLEMENT

Plaintiffs, by and through their attorneys, Stowell & Friedman, Ltd., respectfully submit the parties' proposed class settlement ("Settlement"), which provides meaningful programmatic relief to increase opportunities for a Class of African American and Black Financial Advisors, ("African American Advisors") employed by Defendant JPMorgan Chase Bank, NA ("Chase") and JP Morgan Securities, LLC within Chase Wealth Management; a $19.5 Settlement Fund for Class Members Monetary Awards, attorneys' fees, and Service Awards; and a $4.5 million Diversity and Reserve Fund for Diversity Initiatives, Supplemental Monetary Awards, and Administrative Costs.[1]  This Settlement was negotiated at arm's length; is fair, reasonable, and adequate; and satisfies all criteria for preliminary approval under federal law.  Accordingly, Plaintiffs move this Court for certification of the Class, preliminary approval of the Settlement Agreement, and approval and distribution of Notice to the Class, and state the following in support:

---

[1] The class definition and capitalized terms used herein have the same definition and meaning set forth in the parties' Settlement Agreement, attached hereto as Exhibit 1.

### FACTUAL BACKROUND AND SUMMARY OF SETTLEMENT TERMS

**I.** **Background of This Action and Settlement Negotiations**

1. In early August of 2016, Plaintiff Jerome Senegal, an African American Advisor employed by Chase, retained Class Counsel to represent him with respect to his individual and class-wide claims of race discrimination in employment. Senegal alleged that Chase was engaged in systemic race discrimination against African American Advisors, who were assigned to less lucrative branches and denied business opportunities and resources because of their race, among other things.

2. Class Counsel conducted an extensive investigation into the individual and class-wide claims at issue. They conducted in-depth interviews of potential class members across the United States and reviewed and analyzed company documents and publicly-available information, including information about Chase, the financial services industry, and United States Census data reflecting the demographics of bank territories.

3. As a result of their investigation, Class Counsel filed representative charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") for Plaintiff Jerome Senegal on February 3, 2017; Plaintiff Erika Williams on February 28, 2017; and Plaintiff Brent Griffin on March 24, 2017. Plaintiffs Amanda Jason, Kellie Farrish and Irvin Nash retained Class Counsel and agreed to serve as Class Representatives shortly thereafter, as Class Counsel's investigation continued. (Senegal, Williams, Griffin, Jason, Farrish, and Nash are collectively referred to as Plaintiffs.)

4. Plaintiffs prepared a putative class action complaint on behalf of themselves and a nationwide class of African American and Black Advisors, against the Defendants pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. §

1981.  Prior to filing, Plaintiffs provided a draft of this class action complaint to Chase to explore whether the Parties could settle this dispute prior to  lengthy litigation.  Defendants agreed to explore resolution, and the Parties' counsel, who are experienced class action attorneys, participated in detailed and exhaustive discussions and negotiations, beginning in May of 2017. The parties also executed an agreement tolling and extending the statute of limitations periods and deadlines related to the Plaintiffs' individual and class claims as of April 21, 2017.

5.      In order to properly assess the case on behalf of the class, Class Counsel sought, and Chase produced to Class Counsel, years of employment workforce data, relevant employment policies, and related documents concerning the Advisor workforce and work practices relevant to the claims asserted and damages sought by Plaintiffs and the Class.  Class Counsel and the Named Plaintiffs studied and analyzed the documents and information produced and retained a labor economist from the University of Pennsylvania.  Plaintiffs' expert studied and analyzed over four years of workforce and publicly available census data, in order to calculate relative rates of representation, attrition and compensation by race, the assignment of geographical territory by race, and to prepare damages models based on the claims at issue. Class Counsel also conducted extensive factual and legal research in order to properly evaluate their claims and Chase's defenses in light of the factual record.

6.      Counsel for Chase conducted their own substantial investigations into this matter, including the facts underlying the claims and issued raised in the charges and Complaint.  The investigations included, among other things, reviewing a substantial number of relevant company records and retaining their own expert analysis by a labor economist.

7.      To facilitate and oversee their negotiations, the Parties engaged the services of the Honorable Layn Phillips, a former federal judge who currently serves as a mediator.  Judge

3

Phillips became familiar with the case and conducted two mediation sessions with the Parties and their counsel in New York, New York. Thereafter, Class Counsel and Chase's Counsel conducted numerous telephone conferences and an in-person meeting in New York. Throughout the negotiations, the Parties' counsel bargained vigorously and in good faith on behalf of their respective clients. As a result of the substantial exchange of information, their investigations, and negotiations, counsel for the Parties became familiar with the strengths and weaknesses of their respective positions, and had a full opportunity to assess the litigation risks presented in this case. The formal mediation sessions and follow-up settlement discussions and meetings between the Parties culminated in this Settlement Agreement.

## II.     The Class Settlement

8.      The proposed Settlement, attached as Exhibit A, provides comprehensive programmatic relief and substantial monetary relief for Settlement class members.

### A.      <u>Programmatic Relief</u>

9.      The Settlement provides for programmatic relief to address the primary allegations at issue in this lawsuit and to level the playing field for African American Advisors. Chase has agreed to revise its policies and practices and to take action designed to enhance opportunities for employment, earnings, and advancement of African American Advisors and has committed to the programmatic relief in this Settlement for a three-year period.

10.      <u>Branch Assignment</u>. Chase will commission an expert analysis and review of its branch assignment process for Advisors. The review will analyze the potential correlation between an Advisor's branch(es) assignment and performance, and will examine factors such as branch demographics; branch and personnel designation; data regarding the net worth of the clientele and market, and other branch and territory metrics; assignment of leads, referrals and

4

client accounts to Advisors, and the assignment of Licensed/Private Client Bankers to the Advisors' branches.

11.     <u>Initiatives to Increase Opportunities</u>.  In order to explore and develop ideas and initiatives to increase the number of African American Advisors and increase African American Advisor productivity and retention, Chase will convene a group of African American Advisors (one Financial Advisor and one Private Client Advisor from each of the five Divisions) and Division Directors selected by the Head of Chase Wealth Management.  The group will be sponsored by the Head of Chase Wealth Management, who will assign a Project Manager to chair the group's meetings, and who will receive regular reports about the group's activities and recommendations.

12.     <u>Advisor Coaching</u>.     Chase will provide coaching and training available to African American Advisors through its Advancing Black Leaders program.  Through this Coaching Program, each African American and Black Advisor shall have the opportunity to attend instructor-led sessions focusing on core competencies, including career management, relationship management and navigating the firm.

13.     <u>Efforts to Increase Representation and Increase Transparency</u>.  To increase African American Advisor representation, Chase will engage a dedicated resource to develop initiatives designed to increase the recruitment of African American Advisors.  Upon receiving a conditional offer for an open Advisor position, Chase will provide applicants with data regarding the branch from which they have received an offer that will consist of:  (i) the number of clients serviced by the branch, (ii) the branch's deposits, (iii) the number of affluent households serviced by the branch, (iv) the number of Bankers and Advisors in the branch, and (v) the net new money levels of the branch's current Advisor(s) from the prior twelve months.  If the branch from which

the applicant has received an offer does not have a current Advisor, the applicant will be provided with the net new money levels of previous Advisors.

14.     Management Training and Assessment.  Chase will require all Market Directors undergo diversity training, which will include training on the concepts of implicit bias and racial stereotyping.  Chase will also include its managers' diversity efforts as a component in assessment of manager performance.

15.     Management Selection.  To increase management opportunities for African Americans, Chase will undertake a number of affirmative steps.  Chase will hold regional information meetings to explain the managerial selection process and qualifications, including necessary regulatory licensures.  Chase will inform all African American Advisors of available management coaching and training opportunities.  Chase will provide coaching regarding the management selection process to all African American and Black candidates.  Chase will also post all open positions on Defendant's internal job posting site.

16.     Exit Surveys.  Chase will provide voluntary exit surveys with all departing African American Advisors and share a summary of these interviews with the Project Manager selected by the Head of Chase Wealth Management.

17.     Diversity and Reserve Fund.  As part of the Settlement, at least $1.5 million of the $4.5 million Diversity and Reserve Fund will be set aside to fund diversity programs and initiatives.  These initiatives must be approved by the Head of Chase Wealth Management, and have the goals of promoting equal employment opportunity; providing education, preventing or remedying any form of racial discrimination, harassment, or related retaliation; and fostering recruitment, mentoring, employment advancement, or promotion opportunities for African-Americans at Chase.

6

18.    <u>Monitoring and Reporting</u>.  Chase will meet with and report to Class Counsel annually regarding its compliance with the Programmatic Relief.  Chase will provide information demonstrating any progress made and describe any new programs or policies implemented to increase the representation and success of African American Advisors and discuss the efficacy of those programs or policies.

**B.    Monetary Relief**

19.    In addition to the comprehensive programmatic relief described above, Chase will establish a Settlement Fund of $19.5 million, a Diversity and Reserve Fund of $4.5 million, and will pay the employer's share of payroll taxes and withholdings in connection with monetary awards to class members.  Together, the two funds will compensate Settlement Class Members, including the class representatives; provide for all attorneys' fees, costs, and service awards to class representatives awarded by the Court; and provide for all costs of administering the Settlement.

## ARGUMENT

**I.    The Settlement Class Meets All Requirements of Rule 23(a) and Rule 23(b)(2) and Rule 23(b)(3) and Should Be Certified.**

20.    Plaintiffs move to provisionally certify a class of all African American or Black Advisors who work or worked for Defendants within Chase Wealth Management at any time between April 13, 2013 and the Preliminary Approval Date.

21.    Before assessing whether the settlement is within the range of reasonableness for purposes of preliminary approval, the Court conducts an independent class-certification analysis. The Settlement Class meets all of the requirements for certification under Federal Rule of Civil Procedure 23(a) and Rule 23(b)(2) and (b)(3).

22.     A class should be certified under Rule 23(a) when "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a); *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 923 (7th Cir. 2016).

23.     Here, the proposed Settlement Class includes at least 247 class members who worked as Chase Advisors across the United States, making joinder impracticable. Even "a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849 (7th Cir. 2017); *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 318 F.R.D. 712, 721 (N.D. Ill. 2016). And the geographic dispersion of the putative class adds to the impracticability of joinder. *See Healey v. Int'l Bhd. of Elec. Workers, Local Union No.* 134, 296 F.R.D. 587, 593 (N.D. Ill. 2013).

24.     Common questions of law and fact are presented about whether Chase engaged in a pattern or practice of racial discrimination and whether Chase's policies and practices regarding teaming and the assignment of territory, business opportunities, and resources, among other practices, had an unlawful disparate impact against African American and Black Advisors. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 489 (7th Cir. 2012) ("If the teaming policy causes racial discrimination and is not justified by business necessity, then it violates Title VII as 'disparate impact' employment discrimination—and whether it causes racial discrimination and whether it nonetheless is justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination."), *abrogated in part on other grounds by Phillips v. Sheriff of Cook Cty*, 828 F.3d

8

541, 559 (7th Cir. 2016); *see also Chicago Teachers Union, Local No. 1 v. Bd of Educ. of City of Chicago*, 797 F.3d 426, 440 (7th Cir. 2015).

25.    The class representatives' claims are typical of Class claims because the representatives, like the Class, are African Americans who are or were Chase Advisors and were subjected to the same policies and practices at issue in this litigation. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982).

26.    The class representatives will continue to fairly and adequately protect the interests of the class.  They have devoted significant time to meeting with Plaintiffs' Counsel regarding the claims of the Class and participating in the negotiation of this Settlement.  The class representatives retained experienced counsel, who have been regularly appointed by courts as class counsel, including in other discrimination class action lawsuits against other financial services firms.  *See, e.g., McReynolds v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 05 C 6583, 2012 WL 5278555, at *1 (N.D. Ill. July 13, 2012) (Gettleman, J.); *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 328 F. Supp. 2d 865 (N.D. Ill. 2004) (Castillo, J.); *Martens v. Smith Barney,* No. 96 Civ. 3779, Dkt. 40 (S.D.N.Y. Dec. 10, 1997); *see also Morris v. Risk Mgmt. Alternatives, Inc.*, 203 F.R.D. 336, 344 (N.D. Ill. 2001) (recognizing that counsel who proved adequate in prior cases will likely prove so in future).

27.    Certification under Rule 23(b)(2) is warranted because the class alleges that Defendant "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  FED. R. CIV. P. 23(b)(2); *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 314 F.R.D. 580, 599 (N.D. Ill. 2016).  Plaintiffs allege that every Class Member was subject to firm-wide polices that harmed African Americans.  The Settlement

addresses these allegations and provides programmatic relief designed to increase employment opportunities for African American Advisors.

28.     The class is also properly certified under Rule 23(b)(3).  *See Chicago Teachers Union*, 797 F.3d at 443–45  (vacating denial of class certification where Plaintiffs had sought both injunctive relief under 23(b)(2) and monetary relief under 23(b)(3) regarding their contention that reduction in force by caused disparate impact on African American teachers); *McReynolds*, 672 F.3d at 492 (vacating denial of Rule 23(b)(2) certification despite claims for monetary relief).  For certification under 23(b)(3), "'questions of law or fact common to class members [must] predominate over any questions affecting individual members'" and a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."  *Chicago Teachers Union*, 797 F.3d at 443–44 (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1436–37 (2013), and FED. R. CIV. P. 23(b)(3)).  Those requirements are met here.  *See Kleen*, 831 F. 3d at 926–31 (affirming finding of predominance and superiority where plaintiffs demonstrated common method of proving aggregate class-wide damages).

29.     The parties' settlement is relevant to the Rule 23(b)(3) analysis.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619–20 (1997).  Because Rule 23(b)(3) certification is proposed in the context of a settlement, the "court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."  *Id*. at 620 (citation omitted).  Any manageability or predominance concerns relating to individual proceedings and defenses are satisfied by the settlement and its claims-resolution process. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 660 (7th Cir. 2004) (lauding use of special masters to preside over individual damages proceedings as solution to manageability concerns).

## II.     The Settlement Should Be Preliminarily Approved.

30.     At the preliminary approval stage, courts review class action settlements to determine whether they are "within the range of possible approval." *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982); *In re Nat'l Collegiate Athletic Ass'n,* 314 F.R.D. at 584, 603. "[T]he court's task is ... not to conduct a full-fledged inquiry into whether the settlement meets Rule 23(e)'s standards." *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc*., No. 07 C 2898, 2011 WL 3290302, at \*6 (N.D. Ill. July 26, 2011) (citing *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir.1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998)). This Settlement provides outstanding monetary and programmatic relief to class members and is well within the range of possible approval.

### A.     This Settlement Provides Meaningful Programmatic Relief And Substantial Monetary Relief to Class Members.

31.     The parties agreed upon meaningful programmatic relief, described at pages 4 to 7, designed to increase the representation of and opportunities for African American and Black Advisors. In addition to agreeing to policy changes, Chase has committed its senior leaders to work with African American Advisors and to improve opportunities for African American Advisors. These changes include, among other things: providing coaching and training opportunities to African American Advisors; assigning resources dedicated to developing initiatives to increase the recruitment of African American Advisors; establishing a committee of African American Advisors to work with Division Directors and the Head of Chase Wealth Management to advance the hiring, productivity and retention of African American Financial Advisors; commissioning a review of Chase's branch assignment process; providing branch performance data to Advisor applicants upon receipt of a conditional offer of

11

employment; providing diversity training for all Market Directors; and providing management coaching and training opportunities for African American Advisors.

32.     The Settlement Fund of $19.5 million, plus additional funds from the Diversity and Reserve Fund, provides exceptional monetary relief to the Class Members harmed by the policies and practices challenged in this litigation.  The Settlement also provides a process to allocate fairly and reasonably the benefits of the settlement among all Settlement Class Members, including the class representatives.

33.     The claims resolution process for distributing the Settlement Fund provides Class Members the opportunity to submit a claim form explaining their allegations of race discrimination, financial losses, and any emotional distress they suffered.  These claim forms will be reviewed by independent and qualified neutrals.  Every Class Member who submits a timely claim form will have the opportunity to meet with a Neutral to discuss his or her claim. Finally, in order to make the best informed decisions, the Neutrals will receive background information from Plaintiffs' Counsel regarding Chase's practices and the Class claims.

**B.      The Settlement is an Outstanding Result for the Class in Light of the Risks of Proceeding through Trial and Appeal.**

34.     Absent this Settlement, continued litigation of this action would be complex and lengthy, requiring the investment of considerable resources by both sides and the Court. Liability in this case is contested, and both sides would face considerable risks should the litigation proceed.  In contrast to the complexity, delay, risk, and expense of continuing litigation, the proposed Settlement will produce prompt, certain, and substantial recovery for Class Members.  In light of the complicated, uncertain, and lengthy litigation facing Class Members, a settlement that provides the above programmatic and monetary relief is plainly in the best interests of the Class.

**C.    The Settlement is Supported by Competent, Experienced Counsel and is the Product of Arm's Length, Informed Negotiations.**

35.    Based on its experience and an in-depth analysis of the merits, record, and risks of this action, Plaintiffs' Counsel enthusiastically recommends this Settlement to the Court for approval.  The terms of the proposed Settlement Agreement being presented to the Court were reached after extensive negotiations with the assistance of an experienced and nationally recognized mediator, the Honorable Layn Phillips, a former federal judge.  The settlement negotiations were protracted and difficult and occurred during multiple mediation sessions and subsequent negotiations over nearly two years.  The mediation sessions were attended by class representatives, senior Chase executives, as well as counsel for the parties.  The Settlement is the non-collusive product of extensive litigation and mediation.  These factors weigh heavily in favor of approving the Settlement.

**D.    The Proposed Payments for Class Representatives' Service Awards and Attorneys' Fees Are Reasonable**.

36.    Plaintiffs' Counsel is proud to have advocated for the Class alongside the class representatives and to petition the Court to award Service Awards to compensate the class representatives for their considerable efforts on behalf of the Class.  The $150,000 Service Awards provided for by the Settlement are comparable to similar awards granted by courts in similar cases to class representatives who made substantial investments and sacrifices and achieved outstanding results for the classes of employees they represented.  *See, e.g., McReynolds v. Merrill Lynch,* No. 05-C-6583, Dkt. 616 at 5 (N.D. Ill. Dec. 6, 2013) (Gettleman, J.) (17 class representatives awarded service awards of $250,000 each); *Slaughter v. Wells Fargo,* No. 13 C 06368, 2017 WL 3128802, at *3 (N.D. Ill. May 4, 2017) (Leinenweber, J.) (awarding $175,000 service awards to 6 class representatives); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving $300,000 incentive awards for

class representative in race discrimination case); *Martens v. Smith Barney,* No. 96 Civ. 3779, 1998 WL 1661385, at *4 (S.D.N.Y. July 28, 1998) (class representatives awarded service bonuses up to $150,000 per named plaintiff, $1.9 million in the aggregate in gender discrimination case); *Cremin v. Merrill Lynch*, No. 96 C 3773 (N.D. Ill. 1998) (Castillo, J.) (class representatives awarded service bonuses up to $150,000 per named plaintiff). Plaintiffs' Counsel will file a separate motion in support of the Service Awards.

37.     The Settlement also provides for Plaintiffs' Counsel to petition the Court for reasonable attorneys' fees in an amount no greater than 24.44% of the Qualified Settlement Fund. This 24.44% of the Qualified Settlement Fund is considerably lower than the 33⅓% contingency rate negotiated by the class representatives and set forth in fee agreements entered into as part of this lawsuit. The Seventh Circuit has held that market rate is the best evidence of a reasonable and fair attorney fee. *See Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013); *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998). A fee of 24.44% of the Settlement Fund is reasonable and well within the range of attorneys' fee awards in cases involving comparable risks and litigation costs. *Silverman*, 739 F.3d at 958 (affirming 27.5% fee award of $200 million settlement fund); *Gaskill*, 160 F.3d at 362–63 (approving 38% fee in securities class settlement); *Slaughter*, 2017 WL 3128802, at *3, 24 (approving 25% fee in similar race discrimination class action settlement); *Mansfield v. Airline Pilots Ass'n Int'l*, No. 06 CV 6869, Dkt. 373 ¶¶ 17–18 (N.D. Ill. Dec. 14, 2009) (awarding 35% of $44 million settlement fund for class of senior pilots alleging union discriminated in favor of junior pilots); *Smith v. Nike Retail Servs., Inc.*, No. 03 cv 9110, Dkt. 184 at 9 n.2, 187 ¶ 10 (N.D. Ill. Oct. 1 & 2, 2007) (awarding 32.37% of $7.6 million settlement fund in race discrimination class action).

Plaintiffs' Counsel will submit a separate fee petition with the Motion for Final Approval, along with a request for reimbursement of litigation costs advanced on behalf of the Class.

**III.     The Proposed Class Notice is Appropriate.**

38.     A settlement must provide adequate notice so that each Class Member can make an informed choice about whether to opt out, object, and/or file a timely claim and have an opportunity to receive a monetary award.  The Proposed Class Notices are clear, accurate, and satisfy due process.  The Notices provide a detailed summary of the terms of the Settlement, including the proposed claims resolution process for monetary awards.  They also inform Class Members and potential Class Members how and when to file objections and describe the procedures for opting out and submitting a claim.

**CONCLUSION**

39.     For all the foregoing reasons, the parties respectfully request that the Court issue an order:  (1) certifying the Class for settlement purposes only; (2) preliminarily approving the proposed Settlement; (3) appointing Class Counsel and the Class Representatives; (4) approving and directing distribution to the Class of Notice; and (5) setting a schedule for the final approval process.  Exhibit B is the order proposed by the Parties.

Dated: August 31, 2018

Respectfully submitted,

**STOWELL & FRIEDMAN, LTD.**

By: _Linda D Friedman_
         Linda D. Friedman

Linda D. Friedman
Suzanne E. Bish
George S. Robot
303 W. Madison, 26th floor
Chicago, Illinois 60606
(312) 431-0888 (tel)
(312) 431-0228 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I, Suzanne E. Bish, an attorney, hereby certify that on August 31, 2018, I served the

foregoing *Plaintiffs' Motion For Provisional Class Certification, Preliminary Approval Of Class*

*Action Settlement, And Approval And Distribution Of Notice Of Settlement* via the Court's

CM/ECF system and via electronic mail to Defendant's counsel.

<u>*s/ Suzanne E. Bish*</u>